# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JANE DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00965** |
| | ) | **Judge Aleta A. Trauger** |
| **WILLIAM B. LEE, in his capacity as** | ) | |
| **Governor of the State of Tennessee,** | ) | |
| **and DAVID RAUSCH, in his capacity as** | ) | |
| **Director of the Tennessee Bureau of** | ) | |
| **Investigation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Jane Doe has filed a Motion for Preliminary Injunction (Doc. No. 6), to which Governor William B. Lee and Director David Rausch of the Tennessee Bureau of Investigation ("TBI") have filed a Response (Doc. No. 18), Doe has filed a Reply (Doc. No. 26), and the Governor and Director have filed a Sur-Reply (Doc. No. 30). The Governor and Director have filed a Motion to Dismiss Plaintiff's First Amended Complaint (Doc. No. 35), to which Doe has filed a Response (Doc. No. 39), the Governor and Director have filed a Reply (Doc. No. 43), and Doe has filed a Sur-Reply (Doc. No. 47). For the reasons set out herein, the defendants' motion will be granted as to claims against the Governor and otherwise denied, and Doe's motion will be granted, as modified consistently with this opinion.

## A. Tennessee Sexual Offender Registry and Classification System

Tennessee, like many states, maintains a registry of convicted sexual offenders and imposes a number of restrictions and administrative requirements on the individuals included on that registry. *See Reid v. Lee*, 476 F. Supp. 3d 684, 688–93 (M.D. Tenn. 2020) (listing requirements). The governing statutes (collectively, "the Act") divide registrants into "sexual offenders" and "violent sexual offenders," based primarily on the particular offense of which the person was convicted. *See* Tenn. Code Ann. § 40-39-202(19), (30). In addition to those labels, the Act identifies some registrants as "offenders against children," if their victim was under 12 years of age. *See* Tenn. Code § 40-39-202(1). A (non-violent) sexual offender with no prior conviction for a sexual offense, and whose victim was over the age of 12, may petition TBI to be removed from the registry after ten years, and her petition will be considered in light of a number of factors, including her history of compliance with the Act's restrictions. A violent sexual offender, an offender against children, a sexual offender with a prior conviction, however, will remain on the registry for the remainder of her life. Tenn. Code Ann. § 40-39-207(g)(2).

As the term "sexual offender" suggests, most of the offenses that can result in an individual's placement on the Tennessee registry have an overt sexual component. There is, however, an exception to that rule. Tennessee has chosen to include, on its sexual offender registry, anyone who was convicted of kidnapping a minor other than her own child, *see* Tenn. Code Ann. § 40-39-202(20)(vi), with no mechanism for the convicted person to establish that he or she should be omitted from the registry because his or her underlying offense involved no

---

[1] Unless otherwise indicated, the facts herein are from the First Amended Complaint (Doc. No. 32) and are taken as true for the purposes of the Motion to Dismiss. Because the First Amended Complaint is verified, the court will treat its assertions as evidence for the purposes of the Motion for Preliminary Injunction. (*See id.* at 46.)

2

sexual conduct or motivation. *See* Tenn. Code Ann. § 40-39-207 (describing limited grounds for removal from the registry).

The Act's classification framework is built upon citations to Tennessee criminal statutes, but Tennessee has chosen to require registration both by offenders with Tennessee convictions and by Tennessee residents with qualifying convictions from other jurisdictions. To that end, the Act defines a "conviction" as follows:

> "Conviction" means a judgment entered by a Tennessee court upon a plea of guilty, a plea of nolo contendere, a finding of guilt by a jury or the court notwithstanding any pending appeal or habeas corpus proceeding arising from the judgment. "Conviction" includes, but is not limited to, a conviction by a federal court or military tribunal, including a court-martial conducted by the armed forces of the United States, and a conviction, whether upon a plea of guilty, a plea of nolo contendere or a finding of guilt by a jury or the court in any other state of the United States, other jurisdiction or other country. A conviction, whether upon a plea of guilty, a plea of nolo contendere or a finding of guilt by a jury or the court for an offense committed in another jurisdiction that would be classified as a sexual offense or a violent sexual offense if committed in this state shall be considered a conviction for the purposes of this part.

Tenn. Code Ann. § 40-39-202(1).

## B. Doe's Inclusion on the Registry

Jane Doe is a resident of Greeneville, Tennessee and the mother of an eleven-year-old son, who lives with Doe's mother and some other family members nearby. Doe cannot live with her family (which includes minor children other than her son) or take part in many of her son's school-related activities, because she is on Tennessee's registry as a "violent sexual offender." Doe, however, has never been convicted of—or even alleged to have committed—any crime involving sexual conduct. Rather, she was simply involved in a kidnapping—in which she plausibly may have been a victim, a perpetrator, or both—that happened to involve an infant child whose parents were fighting over control of the child. (Doc. No. 32 ¶¶ 16–17, 85–86.)

3

The events leading up to that situation began in 2010, when Doe and her friend Brooke Stumbo became involved with a man, David Jackson, who, during Doe's brief time dealing with him, threatened to kill Doe's children, raped her repeatedly, and broke her jaw by stomping on her face. (*Id.* ¶¶ 31–32.) Eventually, Jackson came into custody of his own infant child, and, after beating the child's mother, he fled across state lines with the infant, Doe, Stumbo, and another victim. According to Doe, she joined Jackson because he had threatened her children if she did not do so. Early in the trip, Doe successfully alerted authorities to the situation, but the police appear to have ended up mistakenly stopping another, similar car, and the group was not found by law enforcement until a few days later in Miami. (*Id.* ¶¶ 36-41.)

Because state lines were crossed, Jackson's actions attracted the attention of the federal government. He was charged with carjacking and interstate transportation of a stolen vehicle, and a jury convicted him of those charges. (*Id.* ¶ 47.) The sentencing memorandum filed in Jackson's case referred to Doe as a "victim" and acknowledged both Jackson's threats and the fact that he had placed "all four of the victims in his car at high risk of serious bodily harm." (Doc. No. 32-1 at 3.) Jackson, however, was not charged with interstate kidnapping of the infant pursuant to 18 U.S.C. § 1201, because § 1201 does not apply to the actions of a parent against his child. 18 U.S.C. § 1201(a), (h). Section 1201 does not require that the victim be a minor, meaning that Jackson theoretically could have been charged with kidnapping in connection with his adult victims, if federal prosecutors concluded that such charges had been supported and in the interests of justice to bring.

Federal prosecutors, however, apparently viewed the situation differently and considered Doe complicit in the underlying events. Because Doe, unlike Jackson, was not the infant's parent, she, unlike he, *could* be charged federally with interstate kidnapping of the child pursuant

to 18 U.S.C. § 1201. The U.S. Attorney for the Eastern District of Tennessee did so, and Doe was detained pending trial. After six months in custody, she agreed to plead guilty to aiding and abetting kidnapping in violation of 18 U.S.C. §§ 2 and 1201. (Doc. No. 32 ¶ 46.) She was sentenced to 72 months in prison followed by three years of supervised release. Neither her plea agreement, nor her Presentence Investigation Report, nor the judgment against her suggested that she would be required to be on any sexual offender registry. The pre-printed box that would have been checked if registration had been a condition of her anticipated supervised release was not checked. (Id. ¶¶ 49–50.)

In 2015, Doe was released to a halfway house to serve the remainder of her prison term. However, Doe ended up leaving the house without permission, and she was charged with, and convicted of, escape, for which she was "sentenced to an additional 8 months' incarceration to be followed by one year of supervised release, to be served concurrent to the supervised release for the kidnapping offense." (Id. ¶ 51.)

When Doe was nearing release, again, in 2016, the TBI—which operates Tennessee's sexual offender registry—informed Doe's federal probation officer, Cara Widner, that it was taking the position that Doe would be required to register based on her kidnapping conviction. Widner sought an advisory opinion from the prosecuting attorney in Doe's case, Assistant U.S. Attorney Helen Smith. (Id. ¶¶ 52–53.) On May 6, 2016, Smith provided Doe (and Stumbo) a formal Memorandum on the letterhead of the U.S. Attorney's Office for the Eastern District of Tennessee ("Smith Memo"), in which Smith analyzed the underlying laws and concluded that, in

her view, Doe and Stumbo were "not required to register as sex offenders upon their release from federal prison."[2] (Doc. No. 32-2 at 3.)

Smith explained that, when an individual is convicted of an offense under the laws of a jurisdiction other than Tennessee—as Doe was, since her charges were federal—then the individual will only be placed on Tennessee's registry "if the elements of the offense" of which the person was convicted "are the same as the elements for" the Tennessee offense identified in Tennessee's sexual offender registry statutes. Smith compared 18 U.S.C. § 1201 to the relevant Tennessee kidnapping and aggravated kidnapping statutes, Tenn. Code Ann. §§ 39-13-303 and -304, and concluded that "the elements of the federal kidnapping law differ in one major respect from the Tennessee laws: in order to convict a person of Tennessee kidnapping, the government [must] establish that the victim was exposed to substantial risk of bodily injury or suffered bodily injury." (*Id.* at 3.) Smith explained that she and her colleagues who represented the United States in Doe's case "were not required to prove that element of bodily injury to the victim minor . . . in order to convict" and that Doe and Stumbo were therefore "not required to register as sex offenders upon their release from federal prison." (*Id.*)

Widner immediately sent a copy of the Smith Memo by email to TBI General Counsel Jeanne Broadwell, asking Broadwell whether it changed the agency's position regarding whether Doe would be required to register. Broadwell responded the same day, acknowledging that "Tennessee's kidnapping statute may require more than the federal statute," but stating that, in her view, Doe was still required to register. However, Broadwell did not justify her position by citation to any of Tennessee's own registry laws. Rather she cited the federal Sex Offender Registration and Notification Act ("SORNA"). (Doc. No. 32-3 at 1.) The substance of

---

[2] To Doe's knowledge, Jackson has never been required to register as a sexual offender, despite his central role in the events resulting in registration for Doe and Stumbo and Doe's accusation that he raped her. (Doc. No. 32 ¶ 47.)

6

Broadwell's position is difficult to discern, given that, while SORNA creates standards for state sexual offender registries, Tennessee itself dictates who is actually on its registry, through its own statutes. "Congress through SORNA has not commandeered Tennessee, nor compelled the state to comply with its requirements. Congress has simply placed conditions on the receipt of federal funds." *United States v. Felts,* 674 F.3d 599, 608 (6th Cir. 2012).

Doe was released shortly after Broadwell's email, and, in order to avoid criminal prosecution for failure to comply with the Act, Doe registered with the TBI, which classified her as a "violent sexual offender" and an "offender against children" with a lifetime registry obligation. (Doc. No. 32 ¶ 58.)

## C. Doe's Efforts to Change Her Registry Status

In early 2017, Doe suffered a relapse of her drug addiction, which led to her supervised release being revoked and her being sentenced to serve 8 months of incarceration. (*Id.* ¶ 59.) As part of revocation proceedings, Doe asked the U.S. District Court to address the issue of her sexual offender registry status. The judge opined that he did not have the authority, in that setting, to prevent the state from requiring Doe to register, but his Revocation Order clearly indicated that the U.S. District Court, for its part, was not requiring registration. (*Id.* ¶ 60; *see* Doc. No. 32-5 at 4.)

After Doe was next released, she went to the Greene County Sheriff's Department to complete her registration. Greene County Sex Offender Compliance Officer Angie Weems reviewed Doe's case and concluded that, in her view, Doe should not have been required to register at any point. (Doc. No. 32 ¶ 61.) She contacted TBI's Office of General Counsel with her concerns, but TBI said, again, that Doe was required to register for life as a violent sexual offender. (*Id.* ¶ 62.)

Doe explored other avenues for relief. In May 2017, she filed a 28 U.S.C. § 2255 motion attacking her kidnapping conviction on the ground that, because she had been unaware that her conviction would result in a sexual offender registry obligation, her plea had not been knowingly and voluntarily entered. (*Id.* ¶ 63.)

In 2019, while that motion was still pending, Doe petitioned TBI for removal from the registry. On June 21, 2019, TBI sent a one-page letter denying the request with relatively little elaboration. (Doc. No. 32-6.) The letter stated, "Unless your conviction is overturned or you receive exoneration for your sexual conviction [sic], the TBI will not respond to any further requests for termination you might make." (*Id.* at 1.)

On February 25, 2020, the U.S. District Court for the Eastern District of Tennessee denied Doe's § 2255 motion. She appealed the denial, and, on February 22, 2021, the Sixth Circuit affirmed the district court's ruling. (Doc. No. 32 ¶ 66–67.)

On August 19, 2022, an attorney representing Doe sent TBI a letter requesting her removal from the registry. (Doc. No. 32-7.) The letter presented detailed legal arguments for why, in Doe's view, she should not have been required to register based on her federal kidnapping plea and informed TBI that, if it failed to grant Doe's request, she was prepared to seek relief in court. (*Id.* at 4–5.) The TBI never responded to the letter. (Doc. No. 32 ¶ 68.)

**D. This Case**

On September 8, 2023, Doe filed her Complaint against the Director and the Governor, which she accompanied with a verification affidavit. (Doc. No. 1 at 43.) A few days later, she filed a Motion for Preliminary Injunction, requesting that the court order the Director to remove Doe from the registry and enjoin the defendants from applying the state's sexual offender registry statutes to Doe or "individuals similarly situated." (Doc. No. 6 at 1.)

8

On October 8, 2023, with the initial Complaint already pending, an attorney representing Doe sent TBI a letter—this time, directly to the attention of Broadwell—"request[ing] the immediate scheduling of a classification hearing at which Ms. Doe will have, for the first time, the appropriate procedural protections guaranteed to her under the Fourteenth Amendment." (Doc. No. 32-8 at 2.) On October 17, 2023, Broadwell sent a letter in response. The body of the letter read, in full:

> This letter is in response to your letter dated October 8, 2023, in which you requested a "classification hearing" for your client Jane Doe. The Tennessee Bureau of Investigation respectfully denies your request.

(Doc. No. 32-9 at 1.)

On October 24, 2024, Doe filed a verified Amended Complaint that included those post-filing facts,[3] which is currently her operative pleading. She states five Claims for Relief pursuant to 42 U.S.C. § 1983. Doe's First Claim for Relief is based on the allegation that her inclusion on the registry violates her substantive due process rights because there is no rational connection between Tennessee's policy and any legitimate government purpose. (Doc. No. 32 ¶¶ 183–89.) Doe's Second Claim for Relief is based on the allegation that the State of Tennessee violated her procedural due process rights by placing and keeping her on the registry without affording her an opportunity to establish that her conviction and/or underlying conduct had been misclassified. (*Id.* ¶ 194.) Doe's Third Claim for Relief is based on the allegation that the Tennessee statute's language for identifying qualifying offenses based on convictions under non-Tennessee criminal statutes is unconstitutionally vague, at least as applied to some offenses. (*Id.* ¶¶ 199–204.) Doe's Fourth Claim for Relief is based on the allegation that Tennessee's laws and policies improperly

---

[3] Technically, the post-filing facts should have been pleaded as part of a supplemental, not amended, complaint, but the court finds no prejudice based on that technicality and, insofar as it is necessary, retroactively grants leave to file. *See* Fed. R. Civ. P. 15(d).

interfere with Doe's constitutionally fundamental parenting rights. (*Id.* ¶¶ 206–12.) Doe's Fifth Claim for Relief is based on the allegation that aspects of Tennessee's statutory scheme that were adopted after Doe committed her initial offense are being applied to her retroactively in violation of the applicable Ex Post Facto Clause.[4] (*Id.* ¶¶ 213–20.)

On November 6, 2023, the defendants filed a Motion to Dismiss. The defendants argue that the claims against them should be dismissed for lack of subject matter jurisdiction and/or failure to state a claim on which relief can be granted. (Doc. No. 35 at 1.)

## II. LEGAL STANDARD

### A. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four [preliminary injunction] factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327 (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Similarly, "a finding that there is simply no likelihood of success on the merits is usually fatal" to a request for preliminary injunctive relief. *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

---

[4] The U.S. Constitution has two Ex Post Facto Clauses, one of which applies to the federal government and one of which applies to the states. U.S. Const., art I, §§ 9, cl.3, 10, cl. 1. For ease of reading, the court will refer to the provision applicable to the states as "the" Ex Post Facto Clause.

## B. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). However, if a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, as this one does, the plaintiff's burden is significantly less demanding. *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating a facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Gentek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

## C. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must

determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## II. ANALYSIS

### A. Inclusion of the Governor as a Defendant

Tennessee's system of requirements and prohibitions surrounding the sexual offender registry relies on an array of different officials for administration and enforcement. In light of that diffusion of responsibility, some plaintiffs challenging aspects of Tennessee's scheme have named the Governor as a defendant, based on his ultimate responsibility over the executive branch of the Tennessee state government. *See Doe v. Lee*, No. 3:21-CV-00028, 2021 WL 1907813, at *7 (M.D. Tenn. May 12, 2021).

In the period since Doe filed her claims, however, the Sixth Circuit issued a published opinion generally rejecting that practice and holding that the Governor is not an appropriate defendant in a registry-based challenge, unless the plaintiff can identify a specific authority of the Governor to which her injury is sufficiently linked and through which the plaintiff could

12

plausibly receive redress. *See Doe v. Lee*, 102 F. 4th 330, 336 (6th Cir. 2024). None of Doe's allegations involves a specific function of the Governor, and the court, therefore, will dismiss her claims against that office.

## B. Jurisdiction Related to Rausch

The Director says that this court "has very limited jurisdiction over [him]," but he has not actually raised any challenge to the court's personal jurisdiction, which would be the appropriate mechanism for challenging jurisdiction over a person. (Doc. No. 36 at 7.) Rather, he disputes the court's subject matter jurisdiction, meaning that what is at issue is the court's jurisdiction over *the case*. But the court's jurisdiction over most of this case is beyond question. Indeed, as the Director undoubtedly knows, when the Sixth Circuit held that the Governor was not an appropriate defendant in a registry-based challenge, it simultaneously held that the Director *is* an appropriate target for such a suit, as long as the suit itself is sufficiently connected with the Director's implementation authority. *Id.* Three of Doe's claims—her procedural due process claim, her substantive due process claim, and her vagueness claim—are based on the decision to include Doe on the registry, an issue over which the Director has essentially total control. The Ex Post Facto Clause claim focuses on the retroactive classification of Doe as an "offender against children," and such classification is also an issue over which the Director has full control. The court, accordingly, has no basis for finding a lack of jurisdiction regarding those claims.

The Director's argument that he is not an appropriate defendant with regard to the parental rights claim, however, raises a more difficult question, particularly with regard to the "redressability" component of standing and the related concept of "traceability." For a plaintiff to establish that her injury is redressable, she must show that it is "likely, as opposed to merely speculative, that [her] injury will be redressed by a favorable decision" against the relevant

13

defendant. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The enforcement of the Act's restrictions related to parenting, however, are designed to be implemented and/or enforced largely by local law enforcement and school administrators. The Director does not have formal control over what those local officials choose to do. Rather, the Director primarily controls (1) who is on the registry and (2) what information is transmitted by TBI through or in connection with the registry. Doe's claims based on her parental rights are only redressable through the Director, therefore, if her injuries can be traced to those functions in such a way that an injunction directed at them could provide relief.

The Sixth Circuit has held that, when there is a question regarding whether an official's role in an enforcement scheme is sufficient to "satisfy the causation and redressability requirements of standing," the plaintiff can do so "by demonstrating a meaningful nexus between the defendant and the asserted injury." *Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018). The nexus between the TBI and the alleged violation of Doe's parental rights is undeniable; no official will or could enforce the Act against Doe, but for the Director's decision to put her on the registry. Moreover, if Doe prevails on her parenting-related claims, the Director will be an indispensable part of any remedy. If Doe is, in fact, a particular type of registrant against whom those restrictions cannot be applied, then officials will rely on the Director to convey that fact clearly and effectively, so as to avoid inadvertent enforcement actions against her. The court, therefore, finds that all of Doe's claims are redressable through injunctive relief against the Director.

The Director raises a few more arguments that he characterizes as related to jurisdiction, but those arguments actually involve substantive features of Doe's cause of action—not the

14

court's jurisdiction. In particular, the extent to which Doe can obtain injunctive relief involving the application of the Act to individuals other than herself is not a jurisdictional question, but, rather, a question of whether such relief is actually supported under § 1983. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975). The court, accordingly, has no basis for rejecting any of Doe's claims against the Director for lack of jurisdiction.

## C. Due Process

"The Fourteenth Amendment of the United States Constitution protects individuals from the deprivation 'of life, liberty, or property, without due process of law.'" *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting U.S. Const. amend. XIV, § 1). That language "require[s] that the government provide a 'fair procedure' when depriving someone of life, liberty, or property." *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992); citing *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). The question of what procedures will be sufficient in any given instance—that is, "how much process is due"—depends on a number of factors, including, in particular, the nature of the right at issue. *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015). In a handful of situations, however, the substantive basis for the government's actions is so faulty that, under current due process caselaw, no procedure would be sufficient to salvage that course of action. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998).

A § 1983 claim based on the allegation that the government took an action that it theoretically could have taken, if it had provided the appropriate procedures, but failed to provide those procedures, is typically referred to as a "procedural" due process claim, to distinguish it from a "substantive" due process claim targeted at the substantive foundations of a challenged

15

law. Each type of claim, however, is grounded in the guarantee of due process. *See Dep't of State v. Munoz*, 144 S. Ct. 1812, 1822 (2024).

### 1. Substantive Due Process Claims

The substantive support that a law must have to survive substantive due process review depends on the interests involved. The Supreme Court has held that a few rights are so important, and so disfavored as subjects of government interference, that the Due Process Clause 'forbids the government to infringe [those] 'fundamental' liberty interests . . . , no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). A law that does not directly bear on an interest identified in the caselaw as fundamental, however, is typically subject to the significantly less demanding requirements of so-called "rational basis" review. On rational basis review, the policy being challenged bears "a strong presumption of validity," *F.C.C. v. Beach Commcn's, Inc.*, 508 U.S. 307, 315 (1993), and will be upheld as long as there is a "rational relationship" between that policy and a "legitimate government interest," *Fouts v. Warren City Council*, 97 F.4th 459, 467 (6th Cir. 2024) (citing *Kowall v. Benson*, 18 F.4th 542, 548 (6th Cir. 2021)).

Most of the restrictions imposed by the Act are subject to rational basis review, which is the focus of the First Claim for Relief. That claim does not question whether the registry scheme, in general, can survive rational basis review, but whether there is any rational basis for extending that scheme to individuals who, like Doe, were convicted only of kidnapping with no sexual component or motivation. The Fourth Claim for Relief continues that line of thinking, but recognizes that a handful of the restrictions associated with the Act directly affect Doe's ability

16

to direct and participate in the parenting of her child and, therefore, potentially implicate a fundamental right calling for strict scrutiny.

<u>Rational Basis for Requiring Doe to Register</u>

Challenges to a law's rational basis do not succeed often, but they play an important role. As the Supreme Court has recognized, applying meaningful review under the rational basis standard is particularly appropriate when necessary to constrain the government from improperly singling out and punishing a "politically unpopular group" that, though vulnerable, has never been recognized by the Supreme Court's jurisprudence as a suspect class. *Trump v. Hawaii*, 585 U.S. 667, 705 (2018) (citing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). Rational basis review has, for example, been used to invalidate laws unfairly and irrationally targeting the intellectually disabled, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985), people forced by poverty to live in group housing arrangements, *Moreno*, 413 U.S. at 537–38, and, perhaps most prominently in recent years, gays and lesbians, *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The risk of legislation based solely on animus, rather than any genuine policy rationale, is both obvious and pronounced when the subject at issue is individuals who have been labeled as "sexual offenders"—whether or not that label holds up when subjected to closer inspection. The opprobrium that individuals considered sexual offenders face (as appropriate as that opprobrium, in many instances, may be) creates a political dynamic in which policymakers are, for the most part, only ever pulled in one direction—toward more invasive restrictions, more onerous requirements, and more public humiliation. But even the very undemanding strictures of rational basis review establish that there is at least *some* outer boundary beyond which the government

17

cannot simply heap abuse on the registrant population without a connection to a legitimate government purpose.

It is, moreover, fair to question the rationality of a law placing non-sexual offenders on a sexual offender registry. Indeed, Tennessee's own courts have noted the questionable nature of extending the registry to individuals like Doe. *See Dalton v. State*, No. M2014-02156-CCA-R3-ECN, 2016 WL 2638996, at *7 (Tenn. Crim. App. May 5, 2016) (McMullen, J., concurring) (recognizing that "Tennessee courts have yet to directly address the constitutionality of the . . . Act as applied to an individual convicted of an offense that does not involve a component of sex"). The courts of some other states, moreover, have flatly rejected the practice, as set out in their own states' statutes, as unconstitutional. For example, the Florida Supreme Court held in *State v. Robinson*, 873 So.2d 1205 (Fla. 2004), that "where the State concedes that the crime contained no sexual element and the circumstances of the crime conclusively belie any sexual motive, the designation of the defendant as a sexual predator—which then invokes the attendant statutory requirements and prohibitions—based solely on his conviction for kidnapping a minor not his child violates the defendant's right to due process of law." *Id.* at 1217.

In so doing, the Florida Supreme Court favorably cited the Ohio Court of Appeals opinion reaching the same conclusion in *State v. Reine*, No. 19157, 2003 WL 77174 (Ohio Ct. App. 2003). As the court explained in *Reine*, "[i]f anything, the public is likely to be misled" by a policy that defines "sexual offender" to include some individuals who do not meet the ordinary definition of the term. *Id.* ¶ 20. In *ACLU of New Mexico v. City of Albuquerque*, 137 P.3d 1215 (N.M. Ct. App. 2006), the New Mexico Court of Appeals agreed, concluding that "[t]he inclusion of [kidnapping] and false imprisonment as convictions requiring registration as a sex

18

offender is not rationally related to the legitimate interest of the [government] in protecting victims or potential victims of sex offenders." *Id.* at 1226.

More recently, the U.S. District Court for the Southern District of New York granted a preliminary injunction to a plaintiff who, like Doe, was placed on a state registry for non-sexual kidnapping, finding that he was likely to prevail on his substantive due process claim. *Yunus v. Robinson*, No. 17-CV-5839 (AJN), 2019 WL 168544, at *23 (S.D.N.Y. Jan. 11, 2019). The court wrote that "extending the sex offender designation to individuals for whom the absence of a sexual element is undisputed and who have been adjudicated by a state court to pose essentially no sexual risk cannot be justified as a means of protecting against sex offenders falling through the cracks." *Id.* at *10 (emphasis omitted). Rather, the court wrote, "[t]here is no more reason to classify [such a person] as a sex offender . . . than if he had been convicted of shoplifting, drug dealing, or any other crime that has no sexual element at all . . . ." *Id.*

A number of other courts, however, have upheld states' decisions to require registration by individuals with non-sexual kidnapping or false imprisonment convictions. *See, e.g.*, *Robinson v. Knutson*, No. 23-cv-517, 2023 WL 6148550, at *6 (E.D. Wis. Sep. 20, 2023) (upholding provision "[i]n light of recognized findings indicating that many non-family child abduction cases involve sexual assault and that child sex assault is a notoriously underreported crime"); *Waldman v. Thomas*, No. 5:13-cv-2322, 2015 WL 7755415, at *8–10 (N.D. Ala. Dec. 2, 2015); *Collins v. Thomas*, No. 2:12-cv-950, 2015 WL 5125750, at *7 (M.D. Ala. Aug. 31, 2015); *Cox v. Kentucky*, No. 1:10-cv-93, 2010 WL 3909236, at *6 (W.D. Ky. Sep. 30, 2010); *Rainer v. State*, 690 S.E.2d 827, 829-30 (Ga. 2010); *State v. Smith*, 780 N.W.2d 90, 105 (Wis. 2010); *People v. Knox*, 12 N.Y.3d 60, 69, 903 N.E.2d 1149, 1154 (2009); *People v. Johnson*, 870 N.E.2d 415, 425–26 (Ill. 2007); *People v. Bosca*, 871 N.W.2d 307, 356 (Mich. Ct. App. 2015);

*Marlett v. State*, 878 N.E.2d 860, 869 (Ind. Ct. App. 2007). Although some of those cases involved variations on the precise facts and rules at issue, it is fair to say that the caselaw is mixed.

The Director has identified three legitimate purposes with which, he argues, the application of the Act to Doe bears a rational connection. First, the Director suggests that including all individuals with non-parental child kidnapping convictions on the registry serves the purpose of "protecting children from sexual abuse" without the "administrative burden" of determining whether any given non-filial child kidnapping conviction had a sexual component. (Doc. No. 18 at 15.) The Director's argument, in essence, is that, while there may well be no good reason for Doe to be on the sexual offender registry, the government can place her on it as long as it does so pursuant to a policy that would also help it more easily include some individuals whom it *does* theoretically have some legitimate policy reason to include. By that argument, Tennessee could also have a policy of including, on the registry, every person with the same name and birthdate as a sexual offender, because identifying the right person would require the TBI to do more work.

Even if one were to accept such a rationale, however, it would, at most, support including on Tennessee's registry individuals with kidnapping convictions that *might or might not have* involved sexual motivations or a sexual component. The lack of any sexual component in Doe's offense, however, appears to be manifest from the papers associated with her initial case, and, insofar as any question remains about that fact, Doe has been clear that she is willing to do the legwork to clear that ambiguity up. As the Southern District of New York observed, even if one believes that avoiding administrative expense justifies inclusion of some ambiguous convictions on the registry, that rationale makes no sense in the instances in which "no further administrative

20

effort is required" to verify that the underlying actions were not sexual in nature or sexually motivated. *Yunus*, 2019 WL 168544, at *11. Insofar as the Director wishes to rely on Tennessee's interest in protecting against sexual violence in this case, then, his argument runs afoul of the principle that a law cannot survive rational basis review if, "in practical effect," it "simply does not operate so as rationally to further the" legitimate purpose professed. *Moreno*, 413 U.S. at 537.

Second, the Director argues that including Doe and other such individuals on the sexual offender registry is rationally related to Tennessee's "legitimate interest in protecting children from child abductors." (Doc. No. 18 at 15.) Doe, however, has not been placed on a child abductor database. She has been placed on a *sexual offender* database. The Supreme Court has made clear that, "even in the ordinary . . . case calling for the most deferential of standards," a law may be struck down if its substance is "so discontinuous with the reasons offered for it" that any pretense of rationality cannot be sustained. *Romer*, 517 U.S. at 632; *see also Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 653 (1974) (Powell, J., concurring in the result) (arguing that policy would fail rational basis review because it is "either counterproductive or irrationally overinclusive"). It is difficult to see how Tennessee's legitimate interest in preventing child abduction could be served by confusing and potentially misleading the public about the circumstances of Doe's actual offense. If anything, including Doe on a database of sexual offenders, when her offense involved an entirely different set of circumstances and considerations, interferes in Tennesseans' ability to accurately assess the risks associated with her presence in any given setting. The court, therefore, finds that this rationale is similarly unlikely to be sufficient to support the inclusion of Doe on the registry.

21

Finally, the Director argues that, even if there is no actual policy reason to require Doe to register, Tennessee is still rational to do so, because it is trying to comply with federal law—particularly the Adam Walsh Child Protection and Safety Act ("AWCPSA"), a conditional spending statute that places certain requirements on state sexual offender registries in exchange for federal funds. *See United States v. Baccam*, 562 F.3d 1197, 1198 (8th Cir. 2009). Rational basis review, however, applies to federal laws as well as state ones. Insofar as the AWCPSA demands that Tennessee adopt a policy contrary to the Constitution—which it arguably does, *see* 34 U.S.C. § 20911(4)(B), (7)(A)—that command is a dead letter. Tennessee's obligation to comply with due process is not relieved simply because the federal government paid it for the violation.

Ultimately, then, this court joins those other courts that have found a claim such as Doe's to present at least a plausible basis for relief. The Tennessee sexual offender registry is designed for actual sexual offenders; individuals rely on it to learn about actual sexual offenders; law enforcement uses it to know which individuals to treat like actual sexual offenders; and Doe is not an actual sexual offender. While it is true that some individuals who have been convicted only for kidnapping were actually acting with a sexual motivation, a registry can encompass those individuals without extending its reach to every individual who kidnapped a child other than a parent. *See, e.g.*, Iowa Code § 692A.102.1.c(15), (16) (reaching "[k]idnapping . . . if sexual abuse . . . is committed during the commission of the offense" and "[k]idnapping of a minor . . . if a determination is made that the offense was sexually motivated"); N.M. Stat. Ann. § 29-11A-3(I)(6) (reaching "kidnapping . . . when committed with the intent to inflict a sexual offense"); S.C. Code Ann. § 23-3-430(C)(1)(b) (reaching "kidnapping . . . of a person eighteen years of age or older except when the court makes a finding on the record that the offense did not

22

include a criminal sexual offense or an attempted criminal sexual offense"); Tex. Code Crim. Proc. Ann. art. 62.001(5)(C) (reaching kidnapping "if the actor committed the offense or engaged in the conduct with intent to violate or abuse the victim sexually"); Vt. Stat. Ann. tit. 13, § 5401(10)(A)(vi) (reaching "kidnapping with intent to commit sexual assault"). And, while issues of administrative convenience theoretically might support a policy of sweeping some individuals into the registry based on the ambiguous circumstances of their offenses, there is no rational basis for including an individual whose original conviction does not carry even a hint of any sexual motivation or for an individual willing to shoulder the expenses of establishing the lack of a sexual element herself. The court, therefore, finds that Doe has stated a plausible basis for relief with a significant likelihood of success.

<u>Parental Rights</u>

The fact that Doe has a significant chance of prevailing under rational basis review means that her challenges to the portions of the Act bearing on parenting may succeed, whether or not she is correct that those requirements are subject to strict scrutiny. Nevertheless, because a violation of Doe's constitutionally fundamental parenting rights has been raised as a distinct claim for relief, the court will consider whether she is entitled to proceed on that distinct basis.

Doe's starting premise—that some laws interfering with a parent's autonomy are subject to strict scrutiny—is correct. The Supreme Court has, for many decades, recognized that "fundamental rights and liberty interests" entitled to a heightened level of constitutional protection include not only "the specific freedoms protected by the Bill of Rights," but also, among other things, the rights to marry, have children, and direct the education and upbringing of those children. *Glucksberg*, 521 U.S. at 720 (listing cases); *see Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very

existence and survival of the race . . . . We mention these matters not to reexamine the scope of the police power of the States. We advert to them merely in emphasis of our view that strict scrutiny of the classification which a State makes in a sterilization law is essential, lest unwittingly or otherwise invidious discriminations are made against groups or types of individuals in violation of the constitutional guaranty of just and equal laws."). The fact that some rights associated with parenting are considered fundamental, however, does not necessarily mean that every law that interferes with the preferences of a parent is subject to strict scrutiny.

The fundamental parenting-based rights recognized in existing caselaw have chiefly focused on a parent's involvement in major decisions such as where and if the child should to go to school or on whether a parent can have meaningful direct contact with his child at all. *See, e.g., Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925); *Schulkers v. Kammer*, 955 F.3d 520, 541 (6th Cir. 2020). Doe has been unable to identify any caselaw finding a constitutional violation based on the government's interference in discrete, everyday matters such as attending school events or spending the night in the same home, and, insofar as there is caselaw on similar topics, the courts have been skeptical of such claims. *See, e.g., Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (holding that parents' "right to control individual components of their son's education . . . is not constitutionally protected"); *cf. Seger v. Ky. High Sch. Athletic Ass'n*, 453 F. App'x 630, 634 (6th Cir. 2011) ("The fundamental right of parents to control the education of their children does not extend to a right to demand that their children be allowed to participate without restrictions in extracurricular sports in the educational setting that the parents have freely chosen.").

That, of course, does not mean that those aspects of parenting are unimportant. They simply have not been recognized as entitled to a heightened level of constitutional protection.

24

The Supreme Court's caselaw confirms that, "[i]n the vast majority of cases, state law determines the final outcome" of parenting-based legal disputes. *Lehr v. Robertson*, 463 U.S. 248, 256 (1983). As a practical matter, the court notes that governments routinely play a role in the details of day-to-day parenting through the ordinary operation of the family law, education, and child welfare systems, and aggressively constitutionalizing every aspect of those relationships would, in fact, be a significant challenge for both the courts and the Constitution.

It is possible that the Act, as applied to Doe's personal family situation, does, in fact, infringe upon her constitutionally protected right to direct the upbringing of her child, and the court will, therefore, not dismiss this aspect of her claims outright. However, insofar as Doe has a possibility of succeeding on her claim based on the constitutionally fundamental right to parent, that possibility is relatively low, for preliminary injunction purposes.

**2. Procedural Due Process Claim**

The Director argues that the court should dismiss Doe's procedural due process claim because (1) it is untimely and (2) the procedures that the TBI provided were adequate.

<u>Timeliness</u>

"The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). The applicable limitations period in Tennessee is one year. Tenn. Code Ann. § 28–3–104(a); *see Howell v. Farris*, 655 F. App'x 349, 351 (6th Cir. 2016). The general rule is that "[s]tatute-of-limitations defenses are [more] properly raised in Rule 56 motions [for summary judgment], rather than Rule 12(b)(6) . . . motions, because '[a] plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.' " *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359

25

F. Supp. 3d 546, 567 (E.D. Tenn. 2019) (quoting *Paulin v. Kroger Ltd. P'ship I*, No. 3:14-cv-669, 2015 WL 1298583, at *4 (W.D. Ky. Mar. 23, 2015)). However, if it is "'apparent from the face of the complaint that the time limit for bringing the claim[s] has passed,'" then the plaintiff, if he wishes to avoid dismissal, has an "obligation to plead facts in avoidance of the statute of limitations defense." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). Because many of the events underlying Doe's claims—including her initial placement on the registry—happened several years before she filed her Complaint, her allegations at least raise the possibility of addressing the issue of timeliness in connection with Rule 12(b)(6).

The parties, however, disagree regarding when her procedural due process claim arose and, therefore, when the statute of limitations began to run. Although the statute of limitations for a § 1983 claim "is borrowed from state law, the 'date on which the statute of limitations begins to run in a § 1983 action is a question of federal law." *Howell*, 655 F. App'x at 351 (quoting *Eidson*, 510 F.3d at 635). Under federal law, the limitations period ordinarily begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* At that point, the plaintiff has a "complete and present cause of action," such that she may "file suit and obtain relief." *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Generally speaking, "[i]n procedural-due-process claims . . . , a plaintiff's injury accrues at the time that process was denied because 'the allegedly infirm process is an injury in itself.'" *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 461 (6th Cir. 2016) (quoting *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991)). The Director argues that, insofar as Doe had any claim to challenge the adequacy of Tennessee's procedures connected to

her inclusion on the registry, her claim accrued either in 2016, when TBI's decision first went into effect and Doe first registered, or in 2019, when her next request for removal from the registry was rejected. Accordingly, the Director argues, the statute of limitations had long elapsed by the time that Doe filed her initial Complaint in 2023.

Doe argues, however, that the particular procedural deprivation that she is challenging— the denial of any meaningful process through which to challenge the classification of her non-Tennessee conviction pursuant to Tenn. Code Ann. § 40-39-202(a)—did not occur until October 17, 2023, when TBI sent her counsel a letter effectively stating that no such process was available. The Director responds that the lack of any such procedure was readily apparent from Doe's previous rejections and that Doe's argument is, therefore, the equivalent of simply sending an official a procedurally irregular letter urging that official to reconsider a years-old decision, as a mere pretense for manufacturing a fresh deprivation of process to challenge.

The Director's characterization may be correct; indeed, the court finds that it is more likely than not. Even if the final letter was merely a litigation tactic, however, the court does not necessarily have the power to dismiss this claim as untimely, because Doe also argues that she is entitled to equitable tolling. Tennessee law does not recognize equitable tolling as a general doctrine, but state time limitations are only applicable to § 1983 claims insofar as they are consistent with federal law and policy. *See Harris v. United States*, 422 F.3d 322, 331 (6th Cir. 2005) (citing *Wilson v. Garcia*, 471 U.S. 261, 266–67 (2005)). Accordingly, a number of courts have held that, in the context of § 1983, "a body of state tolling law that lacks a provision for equitable tolling is inconsistent with the provision of a complete federal remedy . . . and therefore is overridden by the federal doctrine." *Heck v. Humphrey*, 997 F.2d 355, 358 (7th Cir. 1993), *aff'd on other grounds*, 512 U.S. 477 (1994); *see also Lake v. Arnold*, 232 F.3d 360, 370

(3rd Cir. 2000) ("Equitable tolling can be applied to suits brought under the federal civil rights statutes when the state statute of limitations would otherwise frustrate federal policy . . . ."); *Friedmann v. Campbell*, 202 F.3d 268, 1999 WL 1045281, at *2 (6th Cir. Nov. 8, 1999) (table opinion) (holding that district court should consider on remand whether equitable tolling applies, if, "through no fault or lack of diligence on his part, [the plaintiff] was unable to sue before, even though the defendant took no active steps to prevent him from suing").

Tennessee's own Supreme Court has acknowledged that Tennessee law's lack of equitable tolling represents a departure from the principles embodied in federal law. *See Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 460 (Tenn. 2012) ("[U]nlike other state courts and the federal courts, [Tennessee courts] have declined to recognize the doctrine of equitable tolling in civil cases."). A refusal to recognize conventional principles of equitable tolling would run directly counter to the purposes of § 1983. This court, accordingly, will apply federal principles of equitable tolling in this case. *Cf. Lyons v. Metro. Gov't of Nashville & Davidson Cnty.*, 416 F. App'x 483, 492 (6th Cir. 2011) (suggesting that district court's decision on whether to apply equitable tolling to § 1983 claim governed by Tennessee statute of limitations was subject to review for abuse of discretion).

Equitable tolling is available where a plaintiff demonstrates "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). The doctrine of equitable tolling is to be applied sparingly, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990), and typically arises "only when a litigant's failure to meet a legally–mandated deadline unavoidably arose from circumstances beyond the litigant's control," *Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir.

28

2003). In determining whether equitable tolling is available, courts may consider (1) whether the plaintiff had actual notice of the filing requirements; (2) whether the plaintiff had constructive notice of the filing requirements; (3) whether the plaintiff diligently pursued her rights; (4) whether the defendant is prejudiced; and (5) whether the plaintiff's ignorance of the relevant requirement was reasonable. *McSwain v. Davis*, 287 F. App'x 450, 455 (6th Cir. 2008).

When Doe first learned that she would be expected to register, she diligently sought to challenge that conclusion, and she continued challenging it, through multiple mechanisms, for years.[5] It is, moreover, plausible that the reason that she did not take action sooner was that TBI's opaque, sometimes shockingly informal process left her with no idea where she stood at any given time, unsure whether there were additional mechanisms to explore or additional ways to proceed. Without knowing what procedures were available to her, Doe could not know whether due process was denied. There is, moreover, no evidence that the Director has been prejudiced by Doe's delay, and the reasonableness of that delay is a factual question. Accordingly, even if the Director is correct about the initial accrual, it would be improper to dismiss Doe's claim pursuant to Rule 12(b)(6), without affording her the chance to support an equitable tolling argument.

For the purposes of a preliminary injunction, however, the fact that the defendants have a potentially viable affirmative defense weighs substantially against concluding that Doe has a high likelihood of success on this particular claim. There is a meaningful chance that, when the record is fully developed and a clear picture of TBI's structures and practices is available, then the most persuasive interpretation of events will be that due process was denied in 2016 and that

---

[5] The Director argues that Doe was not diligent in other ways—for example, by failing to pursue a Tennessee chancery court cause of action that may or may not have permitted her to raise her arguments—but the court cannot evaluate that diligence on the Complaint alone.

29

Doe has no sufficient excuse for failing to sue earlier. That chance weighs against relying on this count for the purposes of a preliminary injunction.

Adequacy of Procedures

Generally speaking, in order to establish a procedural due process claim under § 1983, the plaintiff must establish three elements: (1) that she has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that she was deprived of that protected interest within the meaning of the Due Process Clause; and (3) that the state did not afford her adequate procedural rights prior to depriving her of that protected interest. *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002). In cases like this one—where it is undisputed that the government has imposed restrictions on the plaintiff—the first and second factors are closely related. There is little doubt that the Director has deprived Doe of something; the question is whether it is an interest cognizable as a liberty and/or property interest and, if so, whether appropriate procedures were followed.

Doe argues that she has a protectable liberty interest in not being identified in formal, public materials as a sexual offender. The Sixth Circuit does not appear to have definitively considered whether such an interest can support a procedural due process claim, but several other federal circuit courts have concluded that it can. *See Coleman v. Dretke*, 395 F.3d 216, 222 (5th Cir. 2004); *Gwinn v. Awmiller*, 354 F.3d 1211, 1217 (10th Cir. 2004); *Kirby v. Siegelman*, 195 F.3d 1285, 1291 (11th Cir. 1999); *Neal v. Shimoda*, 131 F.3d 818, 829 (9th Cir. 1997). The U.S. Supreme Court has not directly resolved the issue, but Justice Stevens once wrote, in a concurring opinion, that he did not view the question as particularly close, with the right to avoid such a label plainly warranting protection through due process:

> The registration and reporting duties imposed on convicted sex offenders are comparable to the duties imposed on other convicted criminals during periods of

30

> supervised release or parole. And there can be no doubt that the "[w]idespread public access," to this personal and constantly updated information has a severe stigmatizing effect. In my judgment, these statutes unquestionably affect a constitutionally protected interest in liberty.

*Smith v. Doe*, 538 U.S. 84, 111–12 (2003) (Stevens, J., concurring in part and dissenting in part) (citations omitted). Abstract questions aside, it is simply a straightforward fact that being on the registry carries with it real, formal burdens—including economic ones—in addition to imposing one of the most severe reputational injuries that a person can bear. The court, therefore, finds that Doe's status as an individual who is not required to comply with the registry constitutes a valid liberty and/or property interest entitled to some protection from deprivation without due process.

To determine the adequacy of the procedure accorded in connection with the deprivation of a particular interest, courts apply the balancing test developed in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires the weighing of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. An exacting balancing of those factors is largely unnecessary here, however, because Doe plausibly alleges that she was not granted any meaningful formal procedures through which to challenge the classification of her conviction. The court, accordingly, will permit this claim to proceed, although the court will not treat it as a factor in favor of a preliminary injunction.

## F. Vagueness

Doe argues that, in addition to the issues that the court has already discussed, Tennessee's statutory test for determining whether a non-Tennessee conviction gives rise to a registration obligation is impermissibly vague, at least as applied to some convictions (including hers).

31

Impermissibly vague laws "may take two forms, both of which result in a denial of due process." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1183–84 (6th Cir. 1995) (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)). The first of those forms looks to "the standard of conduct to which a citizen is held accountable." *Id.* The second form—which is more relevant here—focuses on whether the vagueness of a term results in an "unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement." *Id.*

The Act defines a "sexual offender" as any person "convicted in this state of committing a sexual offense or [who] has another qualifying conviction." Tenn. Code Ann. § 40-39-202(19). "Sexual offense," is defined as by citation to a list of specifically enumerated Tennessee statutory offenses. Tenn. Code Ann. § 40-39-202(20). "Qualifying conviction" is never explicitly defined, but one can infer its meaning from the Act's provision stating that the term "conviction" includes "a conviction by a federal court or military tribunal" or a "court in any other state of the United States, other jurisdiction or other country . . . for an offense committed in another jurisdiction that would be classified as a sexual offense or a violent sexual offense if committed in this state." Tenn. Code Ann. § 40-39-202(1). By those provisions, for example, a person convicted of rape in another state would be required to register as if he had been convicted of rape in Tennessee, as long as the Kentucky rape "would be classified as" a rape in Tennessee as well. There are, therefore, likely many straightforward applications of the Act's non-Tennessee conviction provisions that pose no constitutional problem of vagueness.

Doe's argument that the law is impermissibly vague as applied to a conviction like hers, however, is persuasive. What, after all, does it mean to assess whether the actions that gave rise to her kidnapping conviction "would be classified as a sexual offense or a violent sexual offense

if committed in this state"? For one thing, some of those actions *were* committed in Tennessee, and Tennessee prosecuting authorities chose not to prosecute Doe for those actions *at all*— which, in and of itself, gives rise to a situation that the Act clearly did not anticipate. More importantly, the Act gives no guidance regarding the extent or type of overlap that must occur between a federal offense and the corresponding Tennessee offense in order for a registration obligation to arise. For example, the Act itself speaks in terms of whether the potential registrant's prior "offense" resulting in a conviction "would be classified as a sexual offense" in Tennessee, but it does not say whether that comparison should be performed by looking at the underlying *actions* or the underlying *statutes*.

Tennessee courts have suggested that the latter course is called for and that, when the Director considers how to classify a non-Tennessee conviction under the Act, he should "look to the elements of the offense [of conviction] to determine its classification in Tennessee." *Miller v. Gywn*, No. E201700784-COA-R3-CV, 2018 WL 2332050, at *4 (Tenn. Ct. App. May 23, 2018) (quoting *Livingston v. State*, No. M2009-01900-COA-R3-CV, 2010 WL 3928634, at *5 (Tenn. Ct. App. Oct. 6, 2010)). That edict, however, does not resolve the question of how the statutes must be compared. In this instance, TBI conceded that the statutes involved different elements, but it apparently found the overlap to be sufficient—for reasons it did not significantly or clearly explain. Indeed, Broadwell's brief email dooming Doe to a lifetime on the registry based only on Broadwell's unilateral, unelaborated interpretation of an ambiguous statute is as convincing an illustration as one is likely to find of exactly how vague statutes can result in dangerous delegations of discretion.

A statute that permits application of the registry based on partial overlap of offenses, but which provides no intelligible standard for assessing that overlap, is unworkably vague, at least

33

as applied to convictions under the federal kidnapping statute. Tennessee might solve that vagueness by, for example, requiring that a defendant's non-Tennessee conviction will only give rise to a registry obligation if it necessarily entailed a jury finding of each element of the relevant Tennessee offense, but Tennessee has affirmatively disavowed that interpretation, without providing an explanation of what alternative workable standard does apply. Doe, therefore, has stated a plausible claim that, while the conviction classification provisions may be permissibly clear with regard to many non-Tennessee convictions, they lack sufficient specificity as applied to her situation, and the court finds a significant likelihood that she will succeed on that claim.

## G. Ex Post Facto Clause

The Ex Post Facto Clause forbids the government from "retroactively . . . increas[ing] the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). It is well-settled that this prohibition covers more than express changes to the particular statutory sentence associated with an offense. *See Peugh v. United States*, 569 U.S. 530, 539 (2013) (noting that the Supreme Court has "never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the *Ex Post Facto* Clause") (citing *Lindsey v. Washington*, 301 U.S. 397 (1937)). To the contrary, a state's "[s]ubtle *ex post facto* violation[]" is "no more permissible than [an] overt one[]." *Collins*, 497 U.S. at 46. The Sixth Circuit has held that the retroactive application of restrictions related to Tennessee sexual offender registry status can violate the Ex Post Facto Clause, and that the court should consider such additional restrictions on a provision-by-provision basis. *See Doe*, 102 F.4th at 336.

Although the sexual offender registry existed when Doe committed her underlying offense, it is undisputed that her treatment under the Act has been changed in at least one way in the intervening years: she is now classified as an "offender against children," a designation that

did not exist when her offense was committed. The Director argues that Doe's classification as an offender against children is inconsequential, given that she is also classified as a violent sexual offender and, therefore, has a lifetime registration obligation regardless. The Supreme Court has recognized, however, that, when a person faces multiple barriers to a desired outcome, she can receive meaningful redress in the form of having one barrier removed—even if it is uncertain that she will ever be able to overcome the other. *See, e.g.*, *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (holding that an individual "seeking to challenge [a] barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing"); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 320 (1978) (ruling in favor of plaintiffs who wished to remove a policy that prevented them from "compet[ing] for" school admission)). It is impossible to know what will happen with Doe's "violent sexual offender" designation, but it is plausible that Doe could receive a reclassification only to being a "sexual offender"—which is, apparently, how Stumbo was forced to register. (*See* Doc. No. 32 ¶ 58.) The imposition of an additional barrier in the form of "offender against children" status is, therefore, plausibly a retroactive change in punishment. The court, accordingly, will not dismiss her Ex Post Facto Clause claim.

**I. Preliminary Injunction**

> ### 1. Likelihood of Success on the Merits

Doe has identified some possibility of success on each of her claims against the Director, but that possibility is significantly more uncertain for some claims than others. The court has found a substantial likelihood of success with regard to three claims: (1) her substantive due process claim based on rational basis review; (2) her vagueness claim; and (3) her Ex Post Facto Clause claim. The third of those claims would only implicate one aspect of Doe's registration

and might, therefore, require some form of targeted injunction that would call on the court to consider the Director's ability to convey to officials that Doe has been classified as not subject to certain requirements. The first two claims, however, involve Doe's inclusion on the registry at all, meaning that they could be addressed with a straightforward injunction requiring the Director to exercise his administrative powers to remove her listing from the public registry. That relief, if granted, would render any more detailed relief regarding the Ex Post Facto Clause unnecessary. The court, moreover, finds that Doe's substantial likelihood of success on the two registry-inclusion claims is sufficient to strongly support a preliminary injunction. The court, accordingly, will proceed based on those two claims.

### 2. Irreparable Injury

The Sixth Circuit has suggested that, "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). At the very least, "irreparable injury is presumed." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). That fact, alone, would support a preliminary injunction.

The irreparable injuries associated with inclusion on the registry, however, are significantly greater than the violation of an abstract right. Doe is being publicly and falsely labeled as a sexual offender by the government of her own state, and the reputational harms of that process cannot simply be undone at the end of litigation. She is, moreover, being excluded from engaging in parenting activities that she cannot simply revisit in the hypothetical future, when her son is older and many milestones have passed. The support for a preliminary injunction from this factor is, therefore, significant.

### 3. Equities/Public Interest

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). It is, moreover, well-established that "the public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). These factors, accordingly, strongly support a preliminary injunction, based simply on the nature of the rights at issue and the significant likelihood that Doe is likely to prevail.

The court also notes that there is a significant public interest in the accuracy of government information, particularly government accusations of stigmatized behavior. It is, therefore, in the interests of the public that, if the state of Tennessee is going to publicly declare some people to be sexual offenders, it do so only with regard to individuals who actually meet the definition of that term, as it would be understood by an ordinary layperson.

There is, moreover, no evidence that granting Doe's request would place an administrative burden on the Director. By its own terms, the registry is designed to have individuals added and removed from its rolls with regularity, so there is no reason to think that removing Doe would be difficult, or that it would be difficult to re-add her at a later date if necessary. Indeed, any costs to the Director appear to be so minimal that the court concludes that no cash surety would be necessary "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). This factor, accordingly, supports preliminary relief.

3. Weighing of Factors, Scope of Injunction

Based on the foregoing factors, Doe is entitled to preliminary injunctive relief to address her ongoing, irreparable injuries associated with (1) being labeled a sexual offender without a rational basis for the state's doing so; and (2) being placed on the sexual offender registry pursuant to an impermissibly vague formula for classifying non-Tennessee convictions. Those injuries are associated with Doe's inclusion on the registry outright, not with the enforcement of any individual provision. As such, the only appropriate remedy is one that is well within the core of the Director's powers: reclassification of Doe as an individual who is not required to register. The court, accordingly, will grant her such an injunction.

Doe, however, has not demonstrated a right to an injunction that would reach other, similarly situated individuals. The Federal Rules of Civil Procedure establish a mechanism through which a party can seek relief on behalf of similarly situated others: a class action pursuant to Rule 23. Rule 23 protects "the individual rights of litigants by imposing demanding standards on class certification." *In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 671 (6th Cir. 2020). If Doe had chosen to proceed under that Rule, the court would have had the opportunity to perform the "rigorous analysis" called for to determine whether a classwide resolution would actually be appropriate. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Because Doe proceeded alone, she is only entitled to assert her rights and seek redress for her own injuries.

Doe points out that there is nothing inherently improper about granting a plaintiff relief that benefits others, and that is true. *See Warth*, 422 U.S. at 499. Still, however, that relief can only be as broad as necessary to address the injury or injuries actually before the court. Because Doe has not sought to assert claims on behalf of a class, the only injury for which she can obtain

38

relief is her own, and she has not demonstrated that an injunction involving any other registrant is necessary to address that injury. The court, accordingly, will limit its injunction to Doe herself.

## V. CONCLUSION

For the foregoing reasons, Doe's Motion for Preliminary Injunction (Doc. No. 6) will be granted as to Doe's inclusion on the registry, and the defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Doc. No. 35) will be granted as to all claims against the Governor, but not as to any claims against the Director.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge